913 So.2d 618 (2005)
Hilda and John GILLET, Appellants,
v.
WATCHTOWER BIBLE & TRACT SOCIETY OF PENNSYLVANIA, INC., Watchtower Bible & Tract Society of New York, Inc., Watchtower Bible & Tract Society of Florida, Inc., The West North Miami Congregation of Jehovah's Witnesses, Inc., Francois JN Denis and Maria Nunes, Appellees.
No. 3D02-817.
District Court of Appeal of Florida, Third District.
May 11, 2005.
Rehearing and Rehearing Denied November 9, 2005.
*619 Shutts & Bowen, Francis A. Zacherl, III, and Colleen A. Hoey, Miami, for appellants.
Adorno & Yoss, Jack R. Reiter, Gregory A. Victor, and Natalie J. Carlos, Miami, for appellees Watchtower Bible & Tract Society of Pennsylvania, Watchtower Bible & Tract Society of New York, Inc., Watchtower Bible & Tract Society of Florida, Inc., and The West North Miami Congregation of Jehovah's Witnesses, Inc. Watchtower Bible and Tract Society of New York, Inc., Legal Department, Mario F. Moreno, Patterson, N.Y., for appellee Watchtower Bible & Tract Society of New York, Inc.
Before GREEN, RAMIREZ[*] and WELLS, JJ.
Rehearing and Rehearing En Banc Denied November 9, 2005.

ON MOTIONS FOR REHEARING, AND CERTIFICATION
WELLS, J.
We grant the Appellants' Motion for Rehearing and deny Appellants' Motion for Certification. We withdraw the opinion issued on Dec. 8, 2004, and substitute the following opinion in its place.
On November 23, 1996, Maria Nunes attended a field service meeting of the members of The West North Miami Congregation of Jehovah's Witnesses, Inc. (the Miami Congregation) at the home of Hilda and John Gillet. During that meeting, the members prepared for that day's field service which, as usual, consisted of door-to-door canvassing and pamphleteering.
After the meeting ended, the members got into their cars to travel to the areas where they would engage in these activities. When Nunes, who was parked in the Gillets' driveway, backed out, she knocked Hilda Gillet into the roadway and where she was struck by an oncoming car.
The Gillets subsequently filed suit against Watchtower Bible & Tract Society of New York, Inc., the entity that publishes Bible based materials such as Awake! and The Watchtower; Watchtower Bible & Tract Society of Pennsylvania, the entity that holds the copyright to the materials published by Watchtower of New York; The West North Miami Congregation at which Nunes worshipped; Nunes; and the driver of the other car that struck her, alleging negligence, vicarious liability, and loss of consortium. The three Watchtower defendants moved for summary judgment claiming that they could not be held vicariously liable as a matter of law *620 for Nunes' negligence since Nunes was neither their employee nor their agent at the time of the accident and that inquiry into this issue would entangle the court in the interpretation of religious teachings, doctrines, and internal policies in violation of the First Amendment. Because we agree that no agency relationship has been demonstrated, we affirm the summary judgment entered in the Watchtower defendants' favor.
"Ordinarily the existence of an agency relationship is a question of fact to be resolved by the factfinder." Eberhardy v. General Motors Corp., 404 F.Supp. 826, 830 (M.D.Fla.1975). "When, however, a party bearing the burden of proof on an issue, fails to produce any supportive evidence, or when (as here) all of the evidence presented by both parties is so unequivocal that reasonable persons could reach but one conclusion, a question that is ordinarily one of fact becomes a question of law, to be determined by the court." Id. Such is the case here.
The essential elements of an actual agency relationship are "(1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."[1]Goldschmidt v. Holman, 571 So.2d 422, 424 n. 5 (Fla.1990). The Gillets claim that there is "ample testimony" that Jehovah's Witnesses like Nunes are agents (or volunteers) of the church defendants when they engage in field service (door-to-door canvassing and proselytizing). They point to formal field service, which features distribution of Watchtower publications, as the centerpiece of the church defendants' activities and argue that because service is so thoroughly directed, regulated and overseen by the church defendants, that Nunes had to be acting as the church defendants' agent when she performed field service. This is insufficient to impose liability for two reasons.
First, when Nunes performed field service, she did so not as the agent of any church entity but, as she stated, "[for] Jehovah God" and as part of a well-established, long recognized-religious practice:
For over 50 years, the Court has invalidated restrictions on door-to-door canvassing and pamphleteering. It is more than historical accident that most of the cases involved First Amendment challenges brought by Jehovah's Witnesses, because door-to-door canvassing is mandated by their religion. As we noted in Murdock v. Pennsylvania, 319 U.S. 105, 108, 63 S.Ct. 870 [87 L.Ed. 1292] (1943), the Jehovah's Witnesses "claim to follow the example of Paul, teaching `publicly, and from house to house.' Acts 20:20. They take literally the mandate of the Scriptures, `Go ye into all the world, and preach the gospel to every creature.' Mark 16:15. In doing so they are obeying a commandment of God."
* * * *
. . . [I]n Murdock v. Pennsylvania, the Court noted that "hand distribution of religious tracts is an age-old form of missionary evangelism-as old as the history of printing presses. It has been a potent force in various religious movements down through the years.... This form of religious activity occupies the same high estate under the *621 First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion. . . ."
Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton, 536 U.S. 150, 158 n. 7, 160-162, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002)(emphasis added)(footnotes omitted)(noting that Jehovah's Witnesses derive their authority to proselytize via door-to-door pamphleteering from the Book of Matthew wherein Jesus instituted a house-to-house search for people to whom to preach the good news). The constraints imposed by the church entities on use of the religious publications that they created, copyrighted, published and distributed, at most, impress upon and demand from each Jehovah's Witness obedience to religious dogma, discipline and authority. See Folwell v. Bernard, 477 So.2d 1060, 1061 (Fla. 2d DCA 1985). They do not make individual congregants agents of these entities.
Second, there is no evidence that Nunes was acting as an agent for any church defendant when she got into her car to go to the place where she was to engage in religious activities. There is no evidence that any church defendant instructed, advised or in any manner controlled the means by which Nunes or any other congregant was to get to the place where they were to proselytize. There also is no evidence that any church defendant knew that Nunes was going to drive her own car as opposed to walking, riding a bike, taking a cab, riding with someone else, or, if available, taking public transportation. There certainly is no evidence that any church defendant asked Nunes to drive her car or attempted to control Nunes' transportation in any manner by providing a vehicle, fuel, insurance, or by checking Nunes' driving record or determining whether she had a valid driver's license. Rather, the record shows that after the meeting at the Gillet home, each congregant was making his or her own way to the place where he or she was going to engage in a religious activity.
In sum, on this record, no agency relationship has been demonstrated.[2]See Brillhart v. Scheier, 243 Kan. 591, 597, 758 P.2d 219, 224 (1988)(where motorists injured by car driven by parish pastor on his way to discuss parish problem brought action against pastor and diocese, Kansas Supreme Court affirmed summary judgment entered in diocese's favor, concluding negligence could not be imputed under doctrine of respondeat superior where pastor engaged in activity within his own discretion and control); see also Nye v. Kemp, 97 Ohio App.3d 130, 646 N.E.2d 262 (1994)(affirming a directed verdict in a church's favor in an action brought against several church groups for damages sustained when church elder's vehicle collided with police cruiser, on a finding of a total lack of the control necessary to establish agency).
Accordingly, we affirm.
RAMIREZ, J., concurs.
GREEN, J. (dissenting from opinion on rehearing).
As I see it, the issue in this case is whether the appellees, Watchtower Bible & Tract Society of New York, Inc., Watchtower Bible & Tract Society of Pennsylvania, Inc., and The Miami Florida Congregation of Jehovah's Witnesses, Inc. [collectively "Watchtower Defendants"], may be vicariously liable under a respondeat superior or agency theory for the *622 personal injuries sustained by the appellants/plaintiffs due to the alleged negligent acts of Nunes, a Jehovah's Witness, while en route to perform Field Service: to distribute the Watchtower Defendants' literature and accept donations on their behalf. In other words, the question presented is whether the record shows that the Watchtower Defendants had the right to control Nunes' activities during Field Service such that a jury can conclude that she was acting as a volunteer agent of the Watchtower Defendants at common law when her alleged careless driving caused injuries to the appellants/plaintiffs. With all due respect to my esteemed colleagues in the majority, I believe that summary judgment is improper. This issue is one properly for the jury.[3]

I. Facts
Defendant Maria Nunes is a Jehovah's Witness. On the day of the accident giving rise to this litigation, Nunes had just attended a Field Service meeting. She was leaving the meeting and proceeding to her designated Field Service area for distribution of Watchtower literature. As she was backing out of the driveway, she struck plaintiff Hilda Gillet and threw her into the path of an oncoming vehicle, causing her severe injuries.
One of the hallmarks of membership in the Jehovah's Witness organization is participation in "Field Service," the systematic distribution of religious literature. Congregants are required to spend ten hours each month in Field Service. Failure to perform Field Service can lead to loss of privileges and status in the congregation. A congregant can be declared "inactive" for failure to participate, and must be "reactivated" by the congregation's Elder after explaining the cause of non-participation.
The literature distributed during Field Service is published by Watchtower New York, the Jehovah's Witnesses' United States governing body. Watchtower Pennsylvania publishes, edits, and holds the copyrights to the distributed materials. Uniformity and consistency in the distribution of the literature is ensured by holding weekly training programs, and periodic follow-up training sessions that instruct congregants on methods of literature distribution. The congregants' progress is evaluated and recorded.
Watchtower New York approves a local congregation's candidate for Edler positions; Elders are required to attend and oversee Field Service meetings where the congregants coordinate the distribution of literature. Each Jehovah's Witness congregant must be approved by the Elders; Watchtower New York also must approve the congregant. The congregant must be trained and must work as an understudy in formal "Field Service." The congregant must be interviewed and approved by two Elders prior to commencing formal Field Service. The Elder's are responsible for the congregant's performance during Field Service. Elders often accompany congregants on Field Service to evaluate their performance.
"Formal Field Service" begins with the congregant attending a Field Service Meeting, conducted by an Elder, or the Elder's appointee. Elders are always present in the field. The Elder tells the congregants where to go that day. The primary tool in Formal Field Service is the Watchtower literature; this is the only literature used. Each congregant is assigned a territory, and they must stay exclusively within that assigned territory. The territories are large and spread out. *623 It is common knowledge that the congregants must use their cars to perform this service.
Beyond controlling the distribution of literature, Watchtower also controls the congregant's appearance. The congregant must observe the Watchtower's dress code, and personal grooming guidelines when engaged in Formal Field Service. These guidelines dictate appropriate attire, and personal appearance. If a congregant does not comply with these requirements they are not allowed to participate in Formal Field Service.
During Formal Field Service, the congregant must request donations for the organization. The Watchtower literature demonstrates that the congregant must raise the issue of donations with the public. All monies collected are remitted to Watchtower New York. Watchtower New York provides the congregations with pre-printed forms to record the hours served by congregants and the donations collected.
On the day of the accident, Nunes was complying with all of these controls and guidelines established by the Watchtower Defendants. Based on these structured controls, the plaintiffs assert that Nunes was acting as the Watchtower Defendants' volunteer agent when she struck the plaintiff with her vehicle.

II. Existence of an Agency Relationship
The plaintiffs essentially contend that the Watchtower Defendants are vicariously liable for their injuries because Nunes was their volunteer agent pursuant to Florida's Volunteer Protection Act[4] and/or common law. The Watchtower Defendants and Nunes, on the other hand, maintain that at the time of the accident, Nunes was not engaged in Field Service as their agent, but rather pursuant to her personal religious convictions. The Watchtower Defendants, and the majority, point to Nunes's deposition testimony that she engaged in Field Service as part of the tenets of her faith. See op. at 620-21. Although Nunes's motivation for engaging in Field Service may have been rooted in her faith, it is not at all dispositive of the issue of whether an agency relationship was in fact created between her and the Watchtower Defendants.
The parties' characterization of their relationship does not control the agency issue. See RESTATEMENT (SECOND) OF AGENCY, § 1 cmt. B (1958) ("[t]he relation which the law calls agency does not depend upon the intent of the parties to create it, nor their belief that they have done so ... if the agreement results in the factual relation between [the parties] to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow."); Nazworth v. Swire Fla., Inc., 486 So.2d 637, 638 (Fla. 1st DCA 1986) ("[t]he agreement's use of a certain descriptive label for one of the contracting parties is not determinative of the actual legal relationship between the parties."); Singer v. Star, 510 So.2d 637, 640 (Fla. 4th DCA 1987) ("A jury may infer the existence of an agency even when both the principal and the agent deny it").
The standard for determining whether an agent is an independent contractor is the degree of control exercised by the employer or owner over the agent. More particularly, it is the right of control and not actual control, which determines the relationship between the parties.
*624 Nazworth, 486 So.2d at 638 (citations omitted). Moreover, the "existence of an agency relationship is a question of fact for the jury, unless the evidence is susceptible of only one interpretation." Folwell v. Bernard, 477 So.2d 1060, 1062 (Fla. 2d DCA 1985)(citing Jaar v. Univ. of Miami, 474 So.2d 239, 242 (Fla. 3d DCA 1985)). The facts in the record before us, as stated supra, and all reasonable inferences therefrom, viewed in the light most favorable to the plaintiffs/appellants,[5] demonstrate that more than one interpretation is possible in this case, making summary judgment improper.
In view of these facts, the two cases upon which the majority relies are distinguishable and do not require affirmance of the summary judgment. In the first case, Nye v. Kemp, 97 Ohio App.3d 130, 646 N.E.2d 262 (1994), the only issue, by stipulation of the parties, was the legal liability of the Ohio District Council of Pentecostal Churches, Inc., for the actions of a church Elder. The Ohio Court of Appeals found that the Council was not liable under a respondeat superior theory because the church had no right to control where Elder meetings were held, who held them, what topics would be covered, or any other aspects of these meetings.
In contrast, in this case the Watchtower Defendants there is record evidence that control virtually every aspect of the Field Service Meetings, and the congregants' voluntary Formal Field Service, including their appearance. The Watchtower Defendants go so far as to require the presence of Elders/trainers at the Field Service calls, and evaluate the congregants' performances to ensure that the Watchtower Defendants' standards are being met. Given the degree of control the Watchtower Defendants exercise, the majority's reliance on Nye is misplaced.
In the second case cited by the majority, Brillhart v. Scheier, 243 Kan. 591, 758 P.2d 219 (1988), the material facts were not disputed. Father Scheier, a Catholic pastor, was driving to a friend's house to discuss matters involving his parish. The Kansas Supreme Court, in affirming a summary judgment in the church's favor, declared that whether a party was an employee depended on whether the organization had the right to control the employee's work. "The employer need not actually control the work of the employee; he need only have the right to control the work." Brillhart, 758 P.2d at 222. The court found that the church had no control over the pastor's day to day activities, and there was no church mandate for the pastor to visit his friend.
The Brillhart scenario is very different from this case. There is record evidence that Nunes's Field Service activities were, again, under the Watchtower Defendants' complete control. She was at the Field Service Meeting because the Watchtower Defendants dictate that these meetings must be held prior to Formal Field Service. She was driving to complete the Formal Field Service required of her as a member of the Watchtower Defendants' organizations.
Furthermore, the fact that Nunes was driving her own car to leave the Field Service Meeting en route to perform Formal Field Service is not dispositive of the agency issue. It is obvious that a person required to perform this type of work in public will have to use some form of transportation. Typically, that transportation will be a person's own vehicle. However, *625 the existence of an agency relationship has never rested on whether the vehicle is the agent's private car, or some form of company transportation. This is illustrated by the following employer vicarious liability cases, where the employee has not been driving a company vehicle.
In Carroll Air Systems, Inc. v. Greenbaum, 629 So.2d 914 (Fla. 4th DCA 1993), for example, the court found that there was sufficient evidence to support a jury's finding that an employer was vicariously liable for injuries caused by an employee while driving home from a business meeting. There was evidence that the employer urged employees to attend the meeting, paid their expenses, and that "the meeting and activities thereafter were within the business interests of the employer," hence, the court concluded that in traveling from the meeting the employee was within the course and scope of employment. Carroll Air Sys., Inc., 629 So.2d at 916. Similarly, in this case, for purposes of establishing an agency relationship between Nunes and the Watchtower Defendants it doesn't matter that Nunes was driving her personal car. Nunes was on her way to an activity required of her by the Watchtower Defendants. She was furthering the Watchtower Defendants' pecuniary interests by distributing their literature and requesting donations on their benefit. The Watchtower Defendants must have known that some congregants would have to drive to their Field Service areas. Under the reasoning in Carroll Air Systems, Inc., the fact that Nunes was driving her personal car is irrelevant. There is enough evidence here to let the jury decide if Nunes was acting as the Watchtower Defendants' agent, exposing them to vicarious liability.
Likewise, in Alsay-Pippin Corp. v. Lumert, 400 So.2d 834 (Fla. 4th DCA 1981), an employee was driving his own vehicle to run an errand for the employer on his way home. Under common law principles of respondeat superior, the court held that the jury could properly conclude that the driver was engaged in the "course and scope" of employment, sufficient to find the employer vicariously liable for the accident the employee caused. See also Saudi Arabian Airlines Corp. v. Dunn, 438 So.2d 116 (Fla. 1st DCA 1983)(employee, while at mandatory training school, was acting within course and scope of employment when he drove to buy food and employer vicariously liable for injuries caused by accident during that drive under respondeat superior doctrine). Certainly, in this case there is sufficient record evidence to create a jury question on this issue, and defeat the summary judgment motion.
In light of this record evidence, I simply cannot agree that the issue as to the Watchtower Defendants' right of control over Nunes's Field Service activities on the date of the accident can be conclusively determined as a matter of law on a motion for summary judgment. This case presents a question for the jury in much the same manner that the issue of fiduciary duty presented a question for the jury in Doe v. Evans, 814 So.2d 370 (Fla.2002). There, the Florida Supreme Court held:
[A]s to the relationships between Doe and Evans and between Doe and the Church Defendants, it is a question for the jury to determine whether a fiduciary relationship arose; the nature of that relationship; and whether as a result of the Church Defendants' conduct, there was a breach of the Church Defendants' duty as fiduciaries to Doe.
Doe, 814 So.2d at 375.
Thus, for all of the foregoing reasons, I respectfully dissent because I believe the summary judgment in this cause must be *626 reversed and this cause remanded for a jury trial.
NOTES
[*] Judge Ramirez did not participate in oral argument.
[1] No apparent agency is claimed or exists. See Mobil Oil Corp. v. Bransford, 648 So.2d 119, 121 (Fla.1995) (an apparent agency exists only if each of three elements are present: (a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation).
[2] For the same reasons, summary judgment was correctly entered on the Gillets' Volunteer Protection Act claim under section 768.1355(1) of the Florida Statutes.
[3] I agree with the majority's conclusion, sub silencio, that there is no First Amendment bar to this claim. Malicki v. Doe, 814 So.2d 347 (Fla.2002).
[4] § 768.1355(1), Fla. Stat. (1995).
[5] Markowitz v. Helen Homes of Kendall Corp., 826 So.2d 256, 259 (Fla.2002) ("When reviewing the entry of summary judgment, `an appellate court must examine the record and any supporting affidavits in the light most favorable to the non-moving party.'").